GRIFFIN, Chief Judge,
dissenting.
I agree with Judge Thompson’s response to the majority’s application of the loitering and prowling statute to the appellant’s conduct in this case. The arresting officer offered no testimony that he observed any behavior on appellant’s part at all, good or bad, “usual” or “unusual.” Certainly, he never observed what the majority describes as “harassing patrons.” He testified only that he had seen L.K.B. and his companions at the location earlier when he was on patrol and, when he arrived at the request of the manager, they were “at the phone.” When the officer told them he needed to talk to them because he had been called by the manager, another person, not appellant, became “aggressive” and “ran his mouth,” but appellant said nothing. The defendant had never even been asked to tone down his behavior, nor was he ever asked to leave the premises. The only evidence of the conduct *194 of these young men came from the store manager, who testified that he observed nothing that caused concern for store or customer safety:
STATE ATTORNEY: Were you concerned for the store safety or the customers’ safety? Were you concerned these individuals might harm customers?
MANAGER: No, not really. I just — I’m concerned about the profitability of my business, and individuals hanging outside the pay phone does not concur with proper business techniques that we like to have at Walgreens or any place.
Apart from the fact that the officer observed no harassing of patrons and that there is no other competent evidence of “harassing patrons,” there is no support anywhere in Florida jurisprudence for the notion that appellant’s behavior in the parking lot of an open business constituted the crime of “loiter[ing] ... in a place, at a time or in a manner not usual for law abiding individuals” under circumstances that warrant a “reasonable alarm or immediate concern for the safety of persons or property.... ” The officer knew that; he did not arrest appellant for “loitering and prowling” but for “resisting officer without violence.” The majority’s conclusion that bad behavior in a public place constitutes the crime of “loitering and prowling” because it isn’t the way “law-abiding” citizens “usually” behave is exactly contrary to the supreme court’s narrow interpretation of the statute when they upheld its constitutionality in State v. Ecker, 311 So.2d 104 (Fla.1975). There’s no evidence of any words spoken by appellant tending to threaten anyone or cause a breach of the peace nor any evidence that any citizen’s way was obstructed. The patrons may or may not have felt harassed, but behaving in a way that makes people uncomfortable or nervous is not an element of the crime of loitering and prowling. I would reverse the conviction for that crime.
As for the majority’s conclusion that a valid Terry stop supports the “resisting arrest without violence” conviction, there is also no evidence in this record that would support a Terry stop. The best the arresting officer could come up with was:
PUBLIC DEFENDER: Officer, what crime did you think was about to occur?
OFFICER: Didn’t know if they possibly were going to steal something from the store or commit a robbery on a person coming in and out of the store.
PUBLIC DEFENDER: What information led you to believe that crime was about to occur?
OFFICER: Well, just them loitering around in the parking lot.
Hanging out in the parking lot of an open business near a telephone furnished for the use of the public, even over the course of a three hour period, does not produce a constitutionally valid suspicion of criminal activity, regardless of how much that conduct annoys the customers. There is nothing in this record to suggest that appellant had any interaction whatsoever with either the manager or any of the store’s customers, much less threaten them. The manager testified the appellant remained by the phone at all times. He never even heard profanity, only “loud conversation.” No customer testified and the most the manager could say was that a patron told him about profanities. As for the “emergency” 911 call, the manager testified that he could not remember if he used 911 but if he did, it was because the store was very busy and he didn’t have the means to go to the office to get the non-emergency number.
The majority’s post hoc determination that the officer had an articulable suspicion of an assault justifying a Terry stop, thereby making it a crime when L.K.B. ran from him creates a disturbing floor for investigative stops, since virtually any conduct will meet it. The officer himself did not consider he was making a Terry stop; he plainly explained what he was doing:
OFFICER: Because they had been hanging there — hanging around there all night long, management advised me that they had been making customers nervous.
They had been there — and I had observed them there for quite some time; you know, I had observed them out *195 there while I was on patrol but finally just got called to there.
And he wanted them trespassed off the property, trespass after warning affidavit issued to them.
******
PUBLIC DEFENDER: Did you have cause to arrest him?
OFFICER: No.
PUBLIC DEFENDER: Did you see him commit any kind of illegal act?
OFFICER: No.
PUBLIC DEFENDER: So he could have refused to tell you who he was with no problem, right? It was just a consensual encounter, right?
OFFICER: No.
PUBLIC DEFENDER: No what?
OFFICER: No, it was not a consensual encounter. It was a police stop.
PUBLIC DEFENDER: Okay. And what was the reason for the stop?
OFFICER: I got called there by the management because they had been loitering ‘ around in front of the store at the pay phone all evening long, making customers nervous. Management had to—
PUBLIC DEFENDER: And the management asked you to remove them from the property?
OFFICER: He asked me to remove them from the property and issue a trespass warning affidavit so they don’t return to the property, because according to management, this has been an ongoing ordeal.
The plain truth is that this defendant was arrested because he ran off when the officer approached him to give him a trespass warning. The problem is that a police officer cannot detain a person and force him to identify himself for the purpose of giving a trespass warning.
Section 810.09, Florida Statutes provides that a person trespasses in violation of that statute by ■willfully entering or remaining in any property other than a structure or conveyance as to which notice against entering or remaining has been given. § 810.09(1), Fla. Stat. (1995). This property owner had a right to ask the defendant to leave his property, and the defendant had the right, as well as the duty, to do so. The fact that the property owner elected to have the police do the asking did not affect this defendant’s right to leave without interference. It also does not confer any special rights upon the officer who is merely acting on behalf of the property owner. The officer’s agreement to convey the trespass warning does not convert this into a “legal duty.”
The correct analysis of a case such as this is found in In the Interest of B.M., 553 So.2d 714 (Fla. 4th DCA 1989). In B.M., a police officer on routine patrol at night observed a group of people standing around a ear in the parking lot of a closed grocery store. No sign warned against trespassing on the property. Because it was a high crime area and the officer was aware of previous burglaries at the store, he approached the group. The group then dispersed, with some walking away and others getting into the car and attempting to leave. The officer stopped the car and then called for backup. The vehicle’s occupants were removed from the vehicle and frisked, and an identification cheek was made. After B.M. exited the ear, a weapon was observed on the seat where he had sat. B.M.’s motion to suppress the weapon was denied by the trial court, but the appellate court reversed. The fourth district held that even if it was assumed that the officers had authority from the premises’ owner to remove trespassers, the officer’s authority where no warning against trespassing had been posted was limited to conveying an order to depart the premises. 553 So.2d at 715. The court added that detention beyond giving the order was permissible only if the officer had a founded suspicion of criminal activity. The bottom line in this case is that appellant has been convicted of two crimes for leaving when approached by a police officer whose purpose and only legal function was to ask him to leave.
I would reverse these convictions.